UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FCA US LLC,

      Plaintiff,

vs.

PATREA R. BULLOCK,

      Defendant.

_____/

Case No. 17-13972

HON. MARK A. GOLDSMITH

## OPINION & ORDER
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 82); GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 80); AND DENYING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR MONETARY DAMAGES (Dkt. 81)

This matter is before the Court on Plaintiff FCA US, LLC's ("FCA") motion for summary judgment (Dkt. 82), Defendant Patrea R. Bullock's motion for summary judgment (Dkt. 80), and Bullock's motion to strike FCA's claims for monetary damages (Dkt. 81). All motions have been fully briefed. Because oral argument will not assist in the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).

The case arises from Bullock's resignation from her employment serving as legal counsel to FCA and subsequent representation of plaintiffs in litigation adverse to FCA. FCA alleges that Bullock improperly retained and used its confidential information after her representation of the company ended. For the reasons that follow, the Court denies FCA's motion for summary judgment, grants in part and denies in part Bullock's motion for summary judgment, and denies Bullock's motion to strike FCA's claims for monetary damages.

# I. BACKGROUND

Bullock is an attorney who previously worked for two law firms in California: Universal & Shannon, LLP ("U&S") (August 2016-May 2017) and Gates, O'Doherty, Gonter & Guy LLP ("GOGG") (June 2017-October 2017). 12/11/17 Bullock Decl., Ex. A to Def. Mot., ¶¶ 1, 5, 33-34, 37 (Dkt. 80-2). FCA was a client of both U&S and GOGG, and during Bullock's time at these law firms, she represented FCA in numerous breach of warranty, or "lemon law," cases. Bullock Dep., Ex. 1 to Pl. Mot., at 39 (Dkt. 82-2). In her role at U&S and GOGG, Bullock developed overall defense strategy based on the facts of individual cases, prepared motions and trial preparation documents, evaluated and advised FCA regarding the merits of cases, and negotiated settlements on behalf of FCA. 12/11/17 Bullock Decl. ¶¶ 10, 44, 63-64. Bullock admits that she obtained privileged and confidential information in the course of her representation of FCA. Answer ¶¶ 12-13, 16 (Dkt. 46).

In April 2017, while working at U&S, Bullock attended a training program conducted by FCA, and signed the "FCA US California Warranty Litigation Trial School Confidentiality Agreement" (the "Confidentiality Agreement"). 12/11/17 Bullock Decl. ¶¶ 17, 28; Confidentiality Agreement, Ex. 2 to Pl. Mot. (Dkt. 82-3). Under the terms of the Confidentiality Agreement, Bullock agreed "to maintain the confidentiality of all non-public documents and information disseminated during trial school that relate to the defense of FCA US ('Confidential Information')." The Confidentiality Agreement further provided that confidential information could be "used solely for purposes of the defense of California warranty actions against FCA US."

Bullock ended her employment with GOGG in October 2017 and opened her own law practice representing plaintiffs with defective vehicles under the California lemon law.[1] 12/11/17 Bullock Decl. ¶¶ 37, 40. Just prior to and immediately after leaving GOGG, Bullock admittedly transferred "every single file" from her work laptop, including FCA documents, to a number of USB devices. Bullock Dep. at 33, 55-56, 58-60. Bullock explained that she copied the contents of her work laptop in order to secure her personal files (e.g., records relating to her personal taxes and her son's college), and with the intention of later deleting GOGG's and FCA's files. Id. at 59-60. Bullock further admitted that one of the USB devices to which she transferred FCA's documents became corrupted, and that she sent the device to an IT firm in Texas to recover the data. Id. at 48-49, 54. However, when the firm informed Bullock that they were unable to recover any of the data, Bullock directed the company to destroy the device. Id.

A forensic examination of Bullock's work laptop confirmed that between October 17, 2017 and November 1, 2017, Bullock used four unique USB devices to store client data. Bandemer Decl. ¶ 8b (Dkt. 82-4). Specifically, on October 31, 2017, a USB device remained connected to Bullock's work laptop for over eight hours, during which time folders labelled "Cases," "Helpful Info," "Lemon Law Cases," "My Business," and "Releases" were created on the USB device. Id. ¶ 8f. Immediately after the USB device was removed, all personal and work files were deleted from the laptop. Id. ¶ 8g.

On November 20, 2017, Bullock filed a lawsuit against FCA in the Superior Court of California, Brown v. FCA US LLC, No. 34-2017-00222086, alleging breach of warranty on behalf of an owner of an FCA-manufactured vehicle. Answer ¶ 31. On December 8, 2017, FCA filed

---

[1] Bullock states that she informed her supervisor at GOGG of her decision to leave the firm on October 26, 2017, and that he severed their relationship. Id. ¶¶ 40-42. However, an exact termination date is not provided.

the instant complaint, alleging claims for breach of contract, misappropriation of trade secrets, and breach of fiduciary duty. Bullock thereafter filed at least two other breach of warranty lawsuits against FCA in California. See Bullock Dep. at 181; see also Pl. Supp. Br. (Dkt. 34) (noting Arias v. FCA US, LLC, No. FCS050161 (Super Ct. of Cal., Fairfield)); Pl. Supp. Notice (Dkt. 37) (noting Lewis v. FCA US LLC, No. CV-18-240 (Super. Ct. of Cal., Yolo)). However, Bullock obtained substitute counsel and no longer retains any cases against FCA. Bullock Dep. at 167, 169-170; 7/25/18 Bullock Decl. ¶ 45.

FCA has filed a motion for summary judgment, arguing that Bullock has admitted to all conduct necessary to prevail on its claims, and that Bullock's counterclaim for attorney fees and costs under 35 U.S.C. § 285 fails as a matter of law (Dkt. 82). In response, Bullock has voluntarily withdrawn her counterclaim. Def. Resp. at 19 (Dkt. 92). However, Bullock also filed a motion for summary judgment, arguing that FCA has failed to produce evidence supporting any of its claims (Dkt. 80). Bullock also seeks to strike FCA's claim for monetary damages on the ground that FCA has failed to propound discovery regarding the amount of its claimed damages (Dkt. 81).

## II.     STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

## III. DISCUSSION

In its complaint, FCA advances claims for breach of contract (Count I), misappropriation of trade secrets under both state and federal statutes (Counts II and III), and breach of fiduciary duty (Count IV). See generally Compl. (Dkt. 1). FCA also advances Count V, which seeks injunctive relief; however, this claim requests a remedy rather than an independent cause of action. See, e.g., Chungag v. Wells Fargo Bank, N.A., 489 F. App'x 820, 826 (6th Cir. 2012); Riley-Jackson v. Ocwen Loan Servicing, LLC, No. 13–cv–12538, 2013 WL 5676827, at *5 (E.D. Mich. Oct. 19, 2013). Both parties seek summary judgment on each of these claims.

### A. Breach of Contract

In Count I of its complaint, FCA maintains that Bullock breached the Confidentiality Agreement when, by her own admission, she took FCA's confidential information after her legal

representation ended and subsequently disclosed and used the files. Pl. Mot. at 16. In response, Bullock contends that FCA attempts to expand the scope of the Confidentiality Agreement beyond its express terms, and that FCA is unable to establish that she disclosed or used any of FCA's confidential information. Def. Resp. at 9.

A party asserting a breach of contract must establish that "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." Miller-Davis Co. v. Ahrens Constr., Inc., 848 N.W.2d 95, 104 (Mich. 2014).[2] When construing a contract, a court's primary objective is to determine the parties' intent. Quality Prod. & Concepts Co. v. Nagel Precision, Inc., 666 N.W.2d 251, 259 (Mich. 2003). When a contract is clear and unambiguous, the provisions reflect the parties' intent as a matter of law, and courts are to enforce the language as written in accordance with its plain and ordinary meaning. Coates v. Bastian Bros., Inc., 741 N.W.2d 539, 543 (Mich. Ct. App. 2007).

The Confidentiality Agreement executed by Bullock during the FCA training program provides as follows:

> Documents and information shared with you at and before the meeting will include FCA US client confidential information. . . . As an attendee, you agree to maintain the confidentiality of all non-public documents and information disseminated during trial school that relate to the defense of FCA US ("Confidential Information"). Confidential Information shall be used solely for purposes of the defense of California warranty actions against FCA US.
>
> . . .
>
> The undersigned attendee understands that they will be learning strategies and tactics key to FCA's defense of Warranty litigation in California and that a breach of this Confidentiality Agreement will cause FCA US to suffer irreparable harm, including harm for which damages would be an inadequate remedy.

---

[2] The Confidentiality Agreement contains a choice-of-law provision designating Michigan law as binding over "any dispute or claim arising out of or in connection with [the agreement] . . . ." Confidentiality Agreement.

Confidentiality Agreement. Under its express terms, the Confidentiality Agreement may be breached in two ways: (1) by a party's <u>disclosure</u> of confidential information or (2) by a party's <u>use</u> of that confidential information for a purpose unrelated to defending FCA in breach of warranty litigation.

As an initial matter, the parties dispute the scope of the Confidentiality Agreement. In much of its briefing, FCA argues broadly that Bullock breached the Confidentiality Agreement by copying, disclosing, and using FCA's "confidential information," without specifying the exact documents or information at issue. <u>See</u> Pl. Mot. at 16; Pl. Resp. at 14 (Dkt. 91). By painting in such broad strokes, FCA implicitly asserts that the Confidentiality Agreement likewise represents a broad agreement protecting the entirety of FCA's confidential data. However, as argued by Bullock, the protections set forth in the Confidentiality Agreement are expressly limited to "all non-public documents and information <u>disseminated during trial school</u> that relate to the defense of FCA US." Confidentiality Agreement (emphasis added). That is, the Confidentiality Agreement protects from disclosure and use only those documents or information specifically shared during the training program.

FCA has failed to specify whether any of the information Bullock copied from her work laptop to USB devices, or allegedly disclosed or used thereafter, was disseminated during the training program. Rather, FCA contends that because Bullock admits she copied "every single file" from her work laptop onto USB drives, she necessarily copied training program documents. Pl. Reply at 1 (Dkt. 96) (citing Bullock Dep. at 58). But FCA's conclusion is sheer speculation, as there is no evidence that Bullock maintained training program materials on her work laptop. FCA, therefore, has not established that any of the confidential information Bullock retained after her employment at GOGG ended was protected under the Confidentiality Agreement.

Further, FCA summarily contends that the Confidentiality Agreement protects information not memorialized in writing but rather learned during the course of the training program. Pl. Reply at 1. However, FCA has failed to identify what confidential information was discussed during the training program. Thus, any breach claim based on orally transmitted confidential information is unsupported for failure to specify what was protected under the agreement.

As to whether Bullock breached the Confidentiality Agreement, FCA asserts three theories under which Bullock purportedly breached the Confidentiality Agreement by using or disclosing FCA's confidential information. First, FCA contends that Bullock disclosed its confidential information by sending one of the USB devices containing FCA's confidential files to an IT firm in Texas. Pl. Resp. at 15. Second, FCA contends that Bullock used its confidential files by copying them to USB devices after her representation of FCA ended—at which point the act of copying the files could not have been for the purpose of defending FCA. Pl. Mot. at 16; Pl. Resp. at 14. Finally, FCA contends that Bullock used certain of FCA's confidential documents in furtherance of her new law firm. Pl. Mot. at 16; Pl. Resp. at 14-15. The Court takes each of these arguments in turn.

With respect to FCA's first theory, Bullock admitted that she sent a corrupted USB device containing FCA's documents to an IT firm in Texas in an effort to recover the data. Bullock Dep. at 48-49, 54. However, the firm informed Bullock that they were unable to recover any of the data, and Bullock directed the company to destroy the device. Id. FCA has supplied no evidence rebutting this testimony. Accordingly, because the data was inaccessible, FCA is unable to establish that this information was actually disclosed or used.

With respect to FCA's second theory, Bullock admitted to copying "every single file" on her work laptop to USB devices just prior to and immediately after her departure from GOGG.

Bullock Dep. at 58. But FCA does not explain how merely copying confidential files, standing alone, amounts to a "use" of those files. In the absence of an alternative definition set forth in the Confidentiality Agreement, the word "use" may be ascribed its plain and ordinary meaning as set forth in dictionaries. Cole v. Auto-Owners Ins. Co., 723 N.W.2d 922, 924 (Mich. Ct. App. 2006). The Michigan court of appeals has noted that the word "use" is defined in the dictionary as "to employ for some purpose," and in Black's Law Dictionary as "[t]he application or employment of something[.]" Aroma Wines & Equip., Inc. v. Columbian Distribution Servs., Inc., 844 N.W.2d 727, 731 (Mich. Ct. App. 2013), aff'd, 871 N.W.2d 136 (Mich. 2015) (internal quotation marks and citations omitted).

Construing the Confidentiality Agreement in accordance with this plain meaning, the word "use" entails an application or employment of FCA's confidential information for some purpose. This interpretation is consistent with the express terms of the Confidentiality Agreement, which authorizes the use of FCA's confidential information "solely for purposes of the defense of California warranty actions against FCA US." Confidentiality Agreement (emphasis added).

Merely copying confidential files does not amount to a "use" because it does not involve an "application" or "employment" of those files for any concrete purpose. FCA offers no argument to the contrary, and it is not the role of the Court to craft an argument on a party's behalf. See McPherson v. Kelsey, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (internal quotation marks and citation omitted)).

Nor has FCA cited authority—and the Court has uncovered none—supporting FCA's theory. In cases holding that a departing employee breached a confidentiality agreement by

copying or transferring the employer's confidential files, the agreements at issue expressly required employees to return the employer's proprietary information or expressly prohibited employees from copying the employer's records. See, e.g., SKF USA, Inc. v. Zarwasch-Weiss, No. 1:10-cv-1548, 2011 WL 13362617, at *26 (N.D. Ohio Feb. 3, 2011); Kurshat v. Gen. Bearing Corp., No. 04-40281, 2007 WL 1018225, at *12 (E.D. Mich. Jan. 9, 2007), adopted in relevant part, 2007 WL 1018224 (E.D. Mich. March 30, 2007). FCA, therefore, cannot establish that Bullock breached the Confidentiality Agreement by copying its confidential files.

Turning to FCA's final breach of contract theory, FCA contends that Bullock admitted during her deposition that she accessed and used certain of FCA's confidential information in furtherance of her new law firm. Pl. Resp. at 14-15. During her deposition, Bullock stated that she accessed the following documents after she left her employment at GOGG: complaints filed against FCA, releases used to settle breach of warranty actions against FCA, "Module 9: Legal-Related Processes," and FCA organizational charts. Bullock Dep. at 74-76, 93, 97. The Court will address Bullock's alleged use of each of these documents in turn.

During her deposition, Bullock admitted that after leaving her employment at GOGG, she "might have" referred to complaints filed against FCA and that "sometimes lawyers use phraseology from somebody else's pleadings." Id. at 74. However, these complaints were created by plaintiffs' attorneys and not by FCA, see id., and would have been publicly available on court dockets. Further, FCA states that the complaints were contained in FCA's case files on which Bullock had actively worked—meaning they were not disseminated during the training program. See Pl. Resp. at 3, 13. Because the complaints are neither "non-public" nor disseminated during the training program, they are not protected under the Confidentiality Agreement. Therefore, any alleged use of the complaints cannot sustain FCA's breach of contract claim.

Bullock also admitted during her deposition that she "probably" reviewed releases, which she stated were "interesting" and "helpful" to review. Bullock Dep. at 74-76, 81. However, she stated that since starting her law firm, she has not created a release on behalf of any client and has never negotiated a settlement against FCA. Id. at 75, 77-78. Bullock further maintained that she never used FCA's confidential information to assist in representing plaintiffs against FCA or for any purpose unrelated to defending FCA. Id. at 77; see also 12/11/17 Bullock Decl. ¶ 55; 7/25/18 Bullock Decl. ¶¶ 8, 13. Thus, although Bullock may have reviewed the releases after her representation of FCA ended, the record does not demonstrate that she disclosed or used this information for any purpose. FCA has failed to come forward with evidence rebutting Bullock's testimony or demonstrating that she used the releases in the course of representing plaintiffs in breach of warranty litigation. Consequently, FCA has not met its burden of raising a triable issue of fact that Bullock breached the Confidentiality Agreement by using the releases in furtherance of her law firm. See Cox v. Ky. Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995) (noting that at the summary judgment stage, "the moving party . . . may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury.").

Finally, while Bullock stated it was possible that she accessed Module 9 and the organizational charts following her departure from GOGG, it would have been for the purpose of identifying the documents and determining whether they were her own personal files or GOGG or FCA files that should be deleted.[3] Id. at 93, 97. Merely accessing Module 9 and the organizational

---

[3] FCA maintains that Module 9 and the organizational charts contain FCA's confidential litigation strategies and tactics. Pl. Mot. at 16-17. While Bullock testified during her deposition that Module 9 "probably" concerns FCA's management of its legal processes, she was not questioned regarding the contents of the organizational charts. See Bullock. Dep. at 89; 94-97. FCA has neither produced these documents for the Court's review nor described their contents in greater detail.

charts for the purpose of identifying the documents is not tantamount to employing the confidential information such that it amounted to a "use." As stated above, Bullock averred that she never used FCA's confidential information to assist in representing plaintiffs against FCA or for any purpose unrelated to defending FCA. Id. at 77; see also 12/11/17 Bullock Decl. ¶ 55; 7/25/18 Bullock Decl. ¶¶ 8, 13. FCA has failed to come forward with evidence raising a triable fact issue that Bullock actually employed Module 9 or the organizational charts in connection with representing plaintiffs in breach of warranty litigation.

FCA contends that it is unable to determine the full extent of Bullock's use of its confidential information without a forensic inspection of Bullock's personal devices. Pl. Resp at 15-16. The Court previously considered and denied FCA's motion to compel a forensic examination of Bullock's personal devices. See generally FCA US LLC v. Bullock, 329 F.R.D. 563 (E.D. Mich. 2019).[4] The Court reasoned that while Bullock stated she already produced all documents in her possession relating to her representation of FCA, FCA produced no evidence demonstrating Bullock was being untruthful or secretly withholding information. Id. at 568. Likewise, FCA has produced no evidence suggesting that Bullock is currently being untruthful in stating that she did not disclose or use FCA's confidential information.

Moreover, the Court's denial of FCA's motion to compel a forensic examination of Bullock's devices in no way hindered its ability to obtain evidence of misappropriation, if such evidence existed. For example, to demonstrate that Bullock used its confidential information in connection with her representation of plaintiffs, FCA could have subpoenaed correspondence

---

[4] On December 20, 2019, the Sixth Circuit denied FCA's petition for a writ of mandamus seeking to vacate this Court's opinion denying FCA's motion to compel and to require forensic imaging of Bullock's personal devices. Order Denying Mandamus Petition at 4 (Dkt. 98). After reviewing the record, the Sixth Circuit concluded that this Court's denial of FCA's motion to compel did not amount to an abuse of discretion warranting mandamus. Id.

between Bullock and FCA's own legal counsel relating to the cases Bullock initiated against FCA. Additionally, FCA could have interviewed its legal counsel regarding Bullock's litigation tactics and possible use of FCA's confidential information. FCA's failure to submit any affidavit from its own counsel only confirms that FCA was not impeded in in its ability to obtain evidence in support of the present action—it simply chose not to pursue such alternate avenues. Accordingly, this Court's refusal to order inspection of Bullock's computer hardly supplies any basis to award summary judgment to FCA or deny it to Bullock.

Because FCA has failed to raise a triable issue of fact that Bullock disclosed or used its confidential information disseminated during the training program, Bullock is entitled to summary judgment with respect to FCA's breach of contract claim.

## B. Misappropriation

In Counts II and III of its complaint, FCA asserts claims of misappropriation of trade secrets under the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws § 445.1902, and under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. FCA seeks monetary relief based on Bullock's alleged actual misappropriation, and injunctive relief based on her alleged threatened misappropriation.

In substance, the elements of a misappropriation claim under MUTSA and the DTSA are largely identical. Radiant Global Logistics, Inc. v. Furstenau, 368 F. Supp. 3d 1112, 1124 n.2 (E.D. Mich. 2019) (citing Mich. Comp. Laws § 445.1902(b); 18 U.S.C. § 1839(5)). Both statutes provide causes of action and remedies for the misappropriation of trade secrets. See Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003). MUTSA defines a "trade secret" as information that (1) "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other

persons who can obtain economic value from its disclosure or use," and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Mich. Comp. Laws § 445.1902(d). As recognized by the Sixth Circuit, Michigan courts have required that an alleged trade secret be identified "'clearly, unambiguously, and with specificity.'" Utilase, Inc. v. Williamson, 188 F.3d 510 (Table) (6th Cir. 1999) (quoting Shatterproof Glass Corp. v. Guardian, Glass Co., 322 F. Supp. 854, 867 (E.D. Mich. 1970)).

The Court must determine whether the documents FCA alleges Bullock misappropriated amount to trade secrets under this statutory definition. FCA asserts that Bullock misappropriated the following documents allegedly reflecting FCA's litigation strategies: complaints filed against FCA, Module 9, FCA organizational charts, the "Corporate Process Guideline," and FCA's releases. Pl. Mot. at 16-17; Pl. Reply at 2 (Dkt. 96). Bullock, in turn, contests FCA's ability to establish that any of these records constitute trade secrets. Def. Mot. at 18.

As discussed above, complaints contained in FCA's case files would have been created by plaintiffs' attorneys and not by FCA. See Bullock Dep. at 74. Further, these documents would have been filed on public court dockets and, therefore, would not have been confidential. "[C]ourts typically focus on ownership as a required element of a claim for trade secrets misappropriation." DaimlerChrysler Servs. v. Summit Nat'l, No. 02-71871, 2006 WL 1420812, at *7 (E.D. Mich. May 22, 2006) (citing 4 Roger M. Milgrim, Milgrim on Trade Secrets § 15.01[1], n.8.1). Moreover, information that is publicly available cannot constitute a trade secret. Wysong Corp. v. M.I. Indus., 412 F. Supp. 2d 612, 627 (E.D. Mich. 2005). Because the complaints were neither owned by FCA nor kept confidential, they may not be considered trade secrets.

With respect to Module 9, the organizational charts, the Corporate Process Guideline, and the releases, Bullock contends that FCA has failed to produce any evidence creating a genuine

dispute that the litigation strategies and tactics reflected in these documents derive value from not being readily ascertainable. Def. Mot. at 18. "'[M]atters of public knowledge or general knowledge in [an] industry, or ideas which are well known or easily ascertainable, cannot be trade secrets.'" PrimePay, LLC v. Barnes, No. 14–11838, 2015 WL 2405702, at *21 (E.D. Mich. May 20, 2015) (quoting Allis–Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp., 255 F. Supp. 645, 654 (E.D. Mich. 1966)). Conversely, "[k]nowledge developed by an employee about how to address a particular customer's peculiar needs, or having developed solutions to specialized needs, can constitute a trade secret." Id. at *21 (citing Hayes–Albion v. Kuberski, 364 N.W.2d 609 (1985)).

Bullock analogizes the present case to Raymond James & Assocs., Inc. v. Leonard & Co., 411 F. Supp. 2d 689, 694 (E.D. Mich. 2006), in which the court held that customer lists maintained by the defendant's former employer were not trade secrets where the lists were readily ascertainable from legitimate channels, including the defendant's memory and own book of business. Similarly, in Rockwell Med., Inc. v. Yocum, 76 F. Supp. 3d 636, 648 (E.D. Mich. 2014), the court held that information concerning a pharmaceutical company's clinical trial protocol was not a trade secret because this information necessarily would have been disclosed to the patients involved in the trials, to the physicians conducting the trials, and to the FDA. Id.

Likewise, Bullock maintains that the litigation strategies set forth in Module 9, the organizational charts, the Corporate Process Guideline, and the releases would be readily ascertainable through legitimate channels—namely, through the experience of attorneys opposing FCA in breach of warranty litigation. Def. Mot. at 18. For example, Bullock contends that information such as the advantages and disadvantages of California warranty law, difficulties FCA has experienced with respect to experts, and FCA's settlement strategies may be easily ascertained

by experienced plaintiffs' attorneys.  Id.  Notably, FCA concedes that this statement "might be true" with respect to some plaintiffs' attorneys.  Pl. Resp. at 17 n.5 (Dkt. 91).

In response to Bullock's argument, FCA has come forward with no evidence establishing the precise nature of the information reflected in Module 9, the organizational charts, the Corporate Process Guideline, or the releases.  FCA has not submitted these documents for the Court's review. While FCA previously sought to submit its confidential documents for an in camera review in connection with its motion for a temporary restraining order, the Court denied the motion on the ground that FCA's privacy concerns were adequately protected under the stipulated protective order.  FCA v. Bullock, No. 17-cv-13972, 2018 WL 719179, at *2 (E.D. Mich. Feb. 6, 2018). Under the protective order, FCA was authorized to seek the Court's leave to file confidential information under seal.  Stipulated Protective Order at 8 (Dkt. 26).  Yet it chose not to do so. Despite the availability of a sealed filing process, FCA has failed to produce evidence demonstrating that these documents contain particularized information regarding FCA's peculiar litigation strategies, as opposed to mere general knowledge.  FCA, therefore, has not met its burden "to 'put up or shut up' on [the] critical issue" of whether these documents constitute trade secrets. See Cox, 53 F.3d at 149 (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).

Because FCA has failed to demonstrate a triable issue that the complaints, Module 9, the organizational charts, the Corporate Process Guideline, or the releases amount to trade secrets, its misappropriation claims fail as a matter of law.  Summary judgment in favor of Bullock on Counts II and III is warranted.

### C. Breach of Fiduciary Duty

Count IV of the complaint sets forth a claim for breach of fiduciary duty. FCA maintains that Bullock breached her fiduciary duties in two ways: (1) by representing plaintiffs in litigation against FCA almost immediately after her representation of FCA ended, and (2) by copying FCA's confidential information after her representation of FCA ended. Pl. Mot. at 21; Pl. Reply at 6. Bullock, in turn, maintains that FCA has not produced sufficient evidence demonstrating that she breached a fiduciary duty. Pl. Mot. at 21-22.

"The elements of a fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages." Delphi Auto. PLC v. Absmeier, 167 F. Supp. 3d 868, 884 (E.D. Mich. 2016) (citation and intern quotations marks omitted). The existence of an attorney-client relationship gives rise to fiduciary duties owed by the lawyer to the client, Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C., 309 N.W.2d 645, 648 (Mich. Ct. App. 1981), and these fiduciary duties extend to both current and former clients, Alpha Capital Mgmt., Inc. v. Rentenbach, 792 N.W.2d 344, 355 (Mich. Ct. App. 2010). "Damages may be obtained for a breach of fiduciary duty when a position of influence has been acquired and abused, or when confidence has been reposed and betrayed." Prentis Family Foundation, Inc. v. Barbara Ann Karmanos Cancer Institute, 698 N.W.2d 900, 908 (Mich. Ct. App. 2005).

The Court first addresses FCA's claim that Bullock breached her fiduciary duties by representing plaintiffs in litigation against FCA. An attorney's representation of a client whose interests are adverse and substantially related to work performed for a former client can give rise to an action for breach of fiduciary duty. Alpha Capital, 792 N.W.2d at 355. In determining whether adverse subsequent employment is substantially related to an attorney's former representation, courts typically evaluate three elements: (1) the nature and scope of the prior

representation, (2) the nature of the present lawsuit against the former client, and (3) whether in the course of the prior representation, the client might have disclosed confidences which could be relevant and detrimental to the present action. Id. at 356.

Bullock contends she is entitled to summary judgment on this claim because FCA has adduced no evidence demonstrating that she breached her fiduciary duties by disclosing or using FCA's confidential information in the course of her subsequent representation of plaintiffs against FCA. Def. Mot. at 21. However, an attorney may breach her fiduciary duties to a client when she engages in an impermissible conflict of interest by simply representing clients whose interests are adverse and substantially related to work performed for a former client. See Airgas, Inc. v. Cravath, Swaine & Moore LLP, No. 10-612, 2010 WL 3046586, at *4 (E.D. Pa. Aug. 3, 2010) (citing Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 602 A.2d 1277, 1283-1285 (Pa. 1992)). Establishing disclosure or use of a client's confidential information constitutes a means of demonstrating that an attorney's breach caused a party to incur damages. See id. at *5, 7 (holding that a former client plausibly pleaded damages resulting from counsel's use of the former client's financing plans, as well as from costs incurred by the former client in enforcing its counsel's ethical obligations and obtaining replacement counsel). Consequently, Bullock is not entitled to summary judgment with respect to this theory of FCA's breach of fiduciary duty claim.

FCA, in turn, maintains that it has established all elements necessary to support its breach of fiduciary duty claim as a matter of law, as Bullock's representation of plaintiffs adverse to FCA was substantially related to work she performed on behalf of FCA. Pl. Mot. at 21. In support of this position, FCA relies on the Eastern District of California's opinion disqualifying Bullock as counsel in one of the breach of warranty claims she initiated against FCA. See Arias v. FCA US, LLC, No. 18-cv-00392, 2018 WL 3419709, at *3 (E.D. Cal. July 11, 2018). In that opinion, the

court credited FCA's arguments that Bullock was privy to information necessary to evaluate, defend, and settle cases on behalf of FCA and that little had changed about the way FCA managed its cases in the few months that had elapsed since Bullock stopped representing FCA.  Id. at *3. Based on evidence submitted with the motion to disqualify, the court found that Bullock "was personally involved in providing legal advice and services on a legal issue that is closely related to the legal issue in the present representation."  Id.

But FCA has cited no authority supporting the notion that the Eastern District of California's decision regarding disqualification is binding on this Court with respect to FCA's breach of fiduciary duty claim.  In any case, it is distinguishable.  First, the analysis employed in disqualification proceedings differs from that employed when evaluating the merits of a breach of fiduciary claim.  Specifically, disqualification proceedings are discretionary in nature and involve a balancing of various factors including plaintiffs' right to counsel of their choosing and preservation of the public trust in the administration of justice.  Id. at *2.  Second, while the Eastern District of California premised its finding that Bullock's representation of FCA was "closely related" to her representation of the plaintiffs on evidence submitted with the motion, the court did not describe what evidence was presented.  See id. at *3.  This Court cannot tell whether the evidence found by the district court in California supporting disqualification would suffice to establish an actionable wrong here, potentially subjecting Bullock to significant damages and possibly being enjoined for some indeterminate period from representing  new clients against her former one.

In connection with the present set of motions, FCA has not proffered evidence permitting the Court to conclude as a matter of law that Bullock's representation of plaintiffs against FCA was substantially related to her prior representation of FCA.  FCA has not established with any

specificity the substance of Bullock's representation of plaintiffs as compared with her representation of FCA. Nor has FCA identified with any specificity what confidential information Bullock supposedly learned in the course of her representation of FCA that could have been relevant to her subsequent representation of plaintiffs. For example, FCA has not established that during her representation of FCA, Bullock learned of a particular defect affecting a particular model of vehicle, and that she subsequently represented a plaintiff in breach of warranty litigation involving that same defect and the same model of vehicle. And, as discussed above, FCA has failed to produce the documents reflecting its litigation strategies, thereby preventing the Court from evaluating whether those alleged confidences may have been relevant to her subsequent representation of plaintiffs.

Simply put, FCA has not presented evidence demonstrating in concrete terms the degree of overlap between Bullock's former representation of FCA and her subsequent representation of plaintiffs against FCA. In the absence of more detailed information, the Court is unable to determine as a matter of law that Bullock's subsequent representation of plaintiffs against FCA is substantially related to her previous representation of FCA. FCA, therefore, is not entitled to summary judgment on this theory of its breach of fiduciary duty claim.

Next, the Court turns to FCA's claim that Bullock breached her fiduciary duties by copying its confidential files after her representation of FCA ended. FCA has failed to cite any authority establishing that such conduct, standing alone, amounts to a breach of fiduciary duty. Consequently, FCA is not entitled to summary judgment on this theory of its breach of fiduciary duty claim. Bullock, in turn, contends this theory fails because she was permitted access to FCA's confidential information for the purpose of defending FCA, and neither FCA nor GOGG ever requested that she return these materials prior to filing the present lawsuit. Def. Mot. at 21. Similar

to FCA, however, Bullock fails to cite any authority establishing the legal significance of these facts with respect to a breach of fiduciary duty claim. Accordingly, Bullock is not entitled to summary judgment with respect to this theory of FCA's claim.

### D. Motion to Strike

Finally, Bullock seeks to strike FCA's claims for monetary damages. Bullock maintains that FCA has not provided computations for each category of damages claimed or produced documents in support of its claim for monetary damages, in violation of its disclosure obligations under Federal Rule of Civil Procedure 26(a)(1)(A)(iii). Def. Mot. to Strike at 6. FCA, in turn, contends that it sufficiently responded that it sustained $317,000 in damages, the amount it expended on developing its trial strategies. Pl. Resp. to Mot. to Strike at 9-10 (Dkt. 90).

Under Federal Rule of Civil Procedure 26(a)(1)(A)(iii), a party must provide in its initial disclosures the following information:

> [A] computation of each category of damages claimed by the disclosing party— who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered . . . .

Initial disclosures must be based on the information then reasonably available to a party. Fed. R. Civ. P. 26(a)(1)(E). If a party fails to comply with its obligations under Rule 26(a), Rule 37(c)(1) provides that "the party is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or is harmless." However, Rule 37(c)(1) gives a court discretion to impose alternative sanctions such as the payment of reasonable expenses including attorney fees.

In the present action, FCA's initial disclosures provide that it is "seeking damages in excess of $317,000," and referenced the declaration of Kris Krueger, FCA's senior counsel. FCA Initial

Disclosures, Ex. 1 to Def. Mot. to Strike, at 7-8 (Dkt. 81-2). In his declaration, Krueger explains that in 2017 alone, FCA expended over $317,000 with respect to its California breach of warranty litigation defense and settlement strategies. Krueger Decl., Ex. A to Pl. Resp. to Mot. to Dismiss, ¶ 2 (Dkt. 15-2). He stated this amount is comprised of "expenditures associated with defense strategy development; meeting with outside California attorneys to implement FCA's defense strategies; development of a system to share defense strategies between FCA and California counsel; and research related to plaintiffs' network of fraud experts." Id.

In its response to Bullock's motion, FCA explains that $317,000 represents an exact figure for the computation of its damages and that Krueger's declaration provides the basis for this amount. Pl. Resp. to Mot. to Strike at 9. Because FCA has provided an exact amount of damages and a description of the types of costs forming the basis of this figure, it has met its burden under Rule 26(a). The facts of this case stand in sharp contrast to caselaw cited by Bullock such as Multimatic, Inc. v. Faurecia Interior Sys. USA, No. 05-60120, 2007 WL 627874, at *7-8 (E.D. Mich. Feb. 26, 2007), in which the defendant utterly failed to provide an estimate or calculation of its damages until it "blindsided [the plaintiff] by calculating its damages for the first time in response to [the plaintiff's] motion for summary judgment."

Bullock also contends that FCA failed to produce evidence in response to her discovery requests seeking documents relating to FCA's calculation of damages. Bullock received FCA's responses objecting to the relevant discovery requests on April 27, 2018. Bullock Disc. Requests, Ex. 2 to Def. Mot. to Strike, at 41 (Dkt. 81-2). Yet, Bullock did not file a motion to compel or a motion challenging the sufficiency of FCA's responses until she filed the present motion to strike on March 18, 2019—nearly one year after she received FCA's responses. Although Rule 37 does not impose a time limitation by which a party must file a motion for sanctions for failure to comply

with Rule 26, courts have recognized that an unreasonable delay in raising a discovery violation to the court's attention results in waiver of that issue. See United States v. Stinson, No. 6:14-cv-1534, 2016 WL 8488241, at *5 (M.D. Fla. Nov. 22, 2016) (collecting cases); see also Case Management & Scheduling Order at 2 (Dkt. 45) ("Any motion to compel discovery must be filed promptly after the grounds for the motion become apparent and reasonable efforts to resolve the dispute have been exhausted."). Bullock offers no explanation for her failure to file a timely motion to compel during the discovery phase. Because of Bullock's unreasonable delay, the Court declines to impose sanctions under Rule 37.

Because FCA did not fail to meet its disclosure obligations under Rule 26(a) and because Bullock unreasonably delayed in pursuing relief in connection with FCA's allegedly deficient discovery responses, the Court denies Bullock's motion to strike FCA's claims for monetary damages.

## IV.  CONCLUSION

For the reasons stated above, FCA's motion for summary judgment is denied (Dkt. 82) and Bullock's motion for summary judgment is granted in part and denied in part (Dkt. 80). Specifically, the Court holds that Bullock is entitled to summary judgment with respect to Counts I, II, and III of FCA's complaint but not with respect to Count IV. Finally, Bullock's pending motion to strike is denied (Dkt. 81).

SO ORDERED.

Dated:  March 13, 2020                    s/Mark A. Goldsmith
      Detroit, Michigan                    MARK A. GOLDSMITH
                                           United States District Judge